# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 30, 2010

## STATE OF TENNESSEE v. TREMAINE NATHANIEL POINTER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-D-2927; 2007-B-1142     Cheryl Blackburn, Judge**

_____

**No. M2009-01424-CCA-R3-CD - Filed June 30, 2010**

_____

The Defendant-Appellant, Tremaine Nathaniel Pointer, appeals the revocation of his probation by the Criminal Court of Davidson County. In case number 2006-D-2927, Pointer entered a guilty plea to possession with intent to sell .5 grams or more of cocaine, a Class B felony. In case number 2007-B-1142, Pointer pled guilty to felony failure to appear, a Class E felony. Pursuant to his plea agreement, he was sentenced as a Range I, standard offender to an eight year term of imprisonment for the drug conviction and was ordered to have a mental health and drug assessment. He was also sentenced to one year for the felony failure to appear conviction, which was imposed to run consecutively to the eight year sentence, for an effective nine-year sentence. The trial court ordered Pointer to serve six months in jail and the remainder of his sentence on supervised probation. After a revocation proceeding on September 19, 2008, Pointer was placed back on probation to be supervised by the community corrections program, and that placement was revoked on June 1, 2009, when the court ordered Pointer to serve his sentence. On appeal, Pointer contends that the trial court abused its discretion by ordering him to serve his sentence in confinement after revoking his probation. Upon review, we affirm the judgment of the trial court revoking Pointer's probation in cases 2006-D-2927 and 2007-B-1142.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Dawn Deaner, District Public Defender; Emma Rea Tennent (on appeal); Jessamine Grice (at hearing), Assistant Public Defenders, Nashville, Tennessee, for the Defendant-Appellant, Tremaine Nathaniel Pointer.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Bret T. Gunn, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Guilty Plea Hearing**. At the May 10, 2007 guilty plea hearing, the State summarized the facts supporting the entry of Pointer's guilty pleas:

> Your Honor, if Mr. Pointer's case . . . had gone to trial, the State's proof would be that on June [27,] 2006[,] the police served a search warrant at 1703 Underwood Street, Apartment 2, where the defendant was there. The police found about thirteen grams of crack cocaine on the roof of the porch near where Mr. Pointer was when the police came up. They questioned Mr. Pointer. He admitted that he had been selling drugs. He had scales, but he claimed that he had stopped selling a couple of days prior. But he did have $266 in cash. He was charged with this offense. He was indicted. He was supposed to be here in court on March [8], 2007, on it, and he did not show up. All this was in Davidson County.

Pointer acknowledged that the aforementioned facts were true . The trial court discussed the specific terms of the plea agreement with Pointer. Pointer acknowledged that he understood the charges against him and understood the sentences he would receive under the plea agreement. The trial court accepted his guilty pleas and sentenced him pursuant to the plea agreement.

At the revocation hearing on September 19, 2008, Pointer waived his right to a hearing and conceded that he violated the terms of his probation by testing positive for marijuana. At the conclusion of the hearing, the court ordered Pointer to enter a dual diagnosis program. It also reinstated Pointer's probation but required that the probation be supervised by the community corrections program.

On April 9, 2009, an arrest warrant was issued alleging that Pointer had violated the terms of his probation by failing to complete his outpatient treatment and by testing positive for Benzodiazepine. On April 17, 2009, an amended arrest warrant was issued that alleged the aforementioned violations as well as the fact that Pointer had absconded.

**Probation Revocation Hearing.** At the June 1, 2009 probation revocation hearing, Brandi Jimmerson, Pointer's supervisor at the community corrections program, testified that

Pointer had been previously diagnosed with bipolar disorder, post-traumatic stress disorder, and a dependency on cannabis. She said that she had been in contact with Pointer at least once weekly and that Pointer had regularly attended the appointments with her, although he would often be late for these appointments.

Jimmerson acknowledged that Pointer went to Bradford Health Services after he attended New Life Lodge. She said that she initially presented an arrest warrant to the court because Pointer had tested positive for marijuana. The trial court declined to sign this warrant because it knew that Pointer was going to receive inpatient treatment at New Life Lodge. Jimmerson stated that Pointer did complete the twenty-eight-day inpatient treatment at New Life Lodge. She said that the community corrections program required Pointer to go to the Bradford Health Services program, which was an aftercare program, following his treatment at New Life Lodge. She said that Pointer had to undergo mental health counseling as a condition of his probation.

Jimmerson stated that she had been initially notified by Bradford Health Services that Pointer had not been attending his sessions. She informed Pointer that he had to attend his sessions or "that would be a violation of the Community Corrections." On March 31, 2009, Bradford Health Services notified her that Pointer was being discharged because someone had reported that he was selling Valium on the premises and that marijuana had been found on his person. Jimmerson said that Pointer adamantly denied distributing drugs at Bradford:

> [Pointer] denied it and denied it. Because I told them, you know, it's kind of coincidental – [Pointer] and I had discussions for weeks about the treatment because he wasn't showing up. And he was telling me the counselor just didn't like him and was making up this and so forth. I informed him that that was not the case. I mean, that's the counselor's job. He was either showing up late or he wasn't. He said he was. So we had a talk about it, and then I got a call from the counselor saying that he was doing better. He had actually attended class every day that week. So things were looking up. And then I got the call again that said that someone else had reported [that he was distributing controlled substances at Bradford].

On April 1, 2009, Jimmerson performed a drug test on Pointer, wherein he tested positive for Benzodiazepine or Valium. She then presented a warrant with a treatment plan to the trial court, which included Pointer's admission into a halfway house. The court signed the warrant and set a fairly low bond. The court told Pointer that if he made bond, it would allow him to attempt the treatment plan. Pointer subsequently made bond, and Jimmerson told him that he needed to call her the next morning regarding his admission into the halfway house. Jimmerson detailed the series of events following Pointer's arrest for the first warrant:

[Pointer] reported on a Tuesday, and he was arrested in the office. That's when I told him if he made bond he needed to call me. He called me that afternoon like he was supposed to. The following morning was when I told him he had to go [to the Recovery Consultants halfway house] that day. And he said that he had to take his baby to the doctor and so forth. So that was on Wednesday morning. He was supposed to have contacted me by lunchtime.

Jimmerson said that she presented an amended warrant to the trial court on Friday morning. She said that she tried to contact Pointer several times prior to presenting the amended warrant to the court. Pointer finally contacted her on Friday afternoon, and she told him about the amended warrant. Jimmerson stated that Pointer told her, "I thought you were supposed to call me." She responded that "he knew that that was not the case because [they] had had the conversation about the doctor's appointment." Jimmerson explained that Pointer knew he was supposed to contact her and that she had tried several times to contact him, but he refused to return her phone calls.

Jimmerson said that the halfway house that Pointer was supposed to attend following the first arrest warrant for a probation violation was called Recovery Consultants. She informed the court that she had already gotten Pointer a bed in a different halfway house, the Ann Betts Halfway Home Transitions, in case the trial court wished for Pointer to go to one following this hearing. She explained that this second halfway house was not as good as Recovery Consultants because it does not have as much to offer individuals, but Recovery Consultants did not currently have room for Pointer.

Jimmerson said that Pointer had been screened for Drug Court, but she thought he had been denied because of his felony failure to appear charge. Jimmerson acknowledged that Drug Court would be a good option for Pointer if he qualified because Pointer needed "quite a bit of structure."

Jimmerson also stated that she contacted New Life Lodge. Although Pointer met New Life Lodge's criteria for admission, she said that Pointer would have to undergo an in-person assessment before determining whether his insurance would pay for the treatment, since Pointer had been incarcerated for so many days. Jimmerson acknowledged that the court would not be able to do anything other than order confinement unless Pointer cooperated and that Pointer had not cooperated as of the hearing date.

Pointer testified that he was aware that this was his second violation of probation and his first violation of the community corrections program. He also acknowledged that he had a substantial amount of time remaining on his sentence. Pointer admitted that he had taken

-4-

Valium prior to his drug test in April when he tested positive for Benzodiazepine. He said that he did not have a prescription for Valium at the time of the drug test. Regarding his discharge from Bradford Health Services, Pointer said that he had Valium at the time but that he did not sell any of it or give any of it away to the other members. He said that he was taking the Valium because it helped with pain he had in his back and hip. He admitted that he never had a prescription for Valium. Pointer said that he had been prescribed Oxycodone last December when he broke his ankle because he did not disclose that he was a drug addict to the prescribing physician. Pointer stated that he had received a mental health diagnosis and had been prescribed Risperdal. He said that he was diagnosed with post-traumatic stress disorder when he was eighteen or nineteen but was unsure what caused him to have this diagnosis. He also said that he had been diagnosed with bipolar disorder. He stated that he believed that both of these disorders sometimes prevented him from completing probation. Pointer then explained why he failed to contact Jimmerson regarding his participation in the Recovery Consultants halfway house:

> I think we just had a misunderstanding because I wanted to do the halfway home. I wanted to get help. You know, I know I need help. I think we just had a misunderstanding because I called her on Friday and asked her what happened to the plan. But I didn't know – I thought she was going to call me, you know. Of course, she said she couldn't get a hold of me.

Pointer said that he was interested in going to the Ann Betts Halfway Home that had been set up. He said that he had been living with his aunt but thought that the halfway house would be better for him because it had more structure. Pointer also said that he was interested in participating in the Drug Court, despite the fact that he had been denied. He also said that he had already participated in the New Life Lodge program earlier that year and that going back there would be helpful for him. Pointer said that, if he were allowed to return, he would make an effort to complete his work. He informed the court that he had been working part-time in landscaping and that his aunt and his grandmother were present in the courtroom. He also stated that he had been attending the Mental Health Co-op since he was eighteen. Pointer said that he had heard about a new program that combined drug issues and mental health issues, and he said that he would like to be screened for that program if it would help him.

Gloria Jackson testified that Pointer was her grandson. Jackson said that Pointer was close with her, his father, and his aunt. She said that Pointer's mother kicked him out of the house when he was a teenager and that "[h]e's been abused and not knowing which way to go." Jackson said that Pointer never lived with her, although she had been an active part of his life. She opined that jail would not help him, but a drug program would help him with his drug addiction because "[h]e needs to be supervised and monitored and motivated."

Jackson said that Pointer does not get much supervision living with his aunt, although he does help her because she is disabled. Jackson said that she would provide transportation so that Pointer could be screened for New Life Lodge.

The State declined to make a closing argument. During closing, defense counsel presented the following three options regarding Pointer: (1) he could attend the Ann Betts Halfway House, (2) he could be screened for the new drug program that has a mental health component, and (3) he could be granted a furlough to be screened by the New Life Lodge program to determine whether his insurance would pay for this program. Defense counsel stated, "I think structure and supervision and someone standing over him is what he needs to be successful on any form of probation."

At the conclusion of the hearing, the trial court refused to allow Pointer to participate in any drug programs. On June 1, 2009, the trial court entered an order revoking Pointer's probation and ordering him to serve the original sentence in confinement. Pointer filed a timely notice of appeal.

## ANALYSIS

Pointer contends that the trial court abused its discretion by ordering him to serve his sentence in confinement after revoking his probation. In response, the State argues that the trial court properly revoked Pointer's probation and ordered him to serve his nine-year sentence in confinement. We agree with the State.

If the trial judge determines that the defendant "has violated the conditions of probation and suspension by a preponderance of the evidence, the trial judge shall have the right . . . to revoke the probation and suspension of sentence and cause the defendant to commence the execution of the judgment as originally entered, or otherwise in accordance with § 40-35-310." T.C.A. § 40-35-311(e) (2006). Probation revocation rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent an abuse of that discretion. State v. Shaffer, 45 S.W.3d 553, 554 (Tenn. 2001) (citing State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991)). In order to establish an abuse of discretion, the defendant must show "that the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." Harkins, 811 S.W.2d at 82 (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980)). Once the trial judge has made the finding that a violation of probation has occurred, he or she has the discretion to order the defendant to (1) serve his sentence in incarceration; (2) serve the probationary term, beginning anew; or (3) serve a probationary period that is extended for up to an additional

two years. State v. Hunter, 1 S.W.3d 643, 647 (Tenn. 1999) (citations omitted); see also T.C.A. §§ 40-35-308, -310, -311.

Here, Pointer concedes that the trial court did not abuse its discretion in finding that he had violated a term of his probation by using Valium without a prescription. However, he claims the trial court abused its discretion in requiring him to serve his sentence in confinement because, in his view, the violation did not warrant such a harsh sentence. He also contends that his rehabilitative efforts during probation should have resulted in the reinstatement of his probation. Pointer claims that the trial court's willingness to set a low bond and to allow him to complete a treatment plan following the April 9 arrest warrant shows that a sentence in confinement was not appropriate. He argues that "nothing transpired between the first warrant of April 9 and the second warrant of April 17 that rendered him unsuitable for community placement." In support of this argument, he asserts that his failure to contact Jimmerson during this time period was directly related to his bipolar disorder and post traumatic stress syndrome, which were things that Jimmerson's treatment plan was attempting to address. Finally, he argues that the court's decision to reinstate his entire sentence "does not serve the ends of justice, and is not in the best interest of either the public or himself." Consequently, he requests that this Court modify the trial court's judgment by allowing his probation to be reinstated.

We conclude that the trial court did not abuse its discretion in ordering that Pointer serve his sentence in confinement. The trial court stressed that confinement was necessary in light of Pointer's refusal to follow his probation terms:

> Well, Mr. Pointer, you know, I am willing to work with anybody who will demonstrate some willingness to cooperate or people who have really serious mental illnesses for which they have trouble understanding things and that – you don't fall within that category. You just do kind of what you want to do when you want to do it. And, you know, two or three times of that – and we've thrown virtually every program we can at you, and you still won't cooperate. You know, there comes a time, Mr. Pointer, where you're just going to have to be in custody. And you have reached that point. So the sentence is going to be placed into effect.

Once the trial court determined that Pointer violated the terms of his probation, it was authorized "to cause execution of the defendant's original judgment as it was originally entered." Hunter, 1 S.W.3d at 647 (citing T.C.A. § 40-35-310). We conclude that the trial court did not abuse its discretion in ordering Pointer to serve his sentence in confinement. The record shows that after Pointer entered guilt pleas to possession with intent to sell .5 grams or more of cocaine and felony failure to appear, he violated the terms of his probation

by being discharged from Bradford Health Services without completing his treatment, by testing positive for Benzodiazepine, and by absconding. At the September 18, 2008 hearing, the trial court reinstated Pointer's probation rather than ordering confinement. The trial court also gave Pointer an opportunity to avoid confinement when it approved the treatment plan offered by Jimmerson when she presented the April 9, 2009 arrest warrant. Despite these opportunities, Pointer failed to contact Jimmerson regarding his halfway house placement. We conclude that the trial court acted well within its discretion by ordering Pointer to serve his original sentence in confinement. Accordingly, Pointer is not entitled to relief.

## CONCLUSION

Upon review, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE